1
2
3
4
5
6

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**FORT PIERCE DIVISION**

**CASE NO.:  21-cr-14033-AMC-1**

7   UNITED STATES OF AMERICA,      )
                                   )
8            Plaintiff,            )          August 23, 2021
     v.                            )
9                                  )
     EVERETTE JEROME JACKSON, JR., )
10                                 )          Pages 1 - 24
             Defendant.            )
11   _____/

12
13
14
15
16
17

                     DETENTION HEARING

                  (Via Videoconference)

            BEFORE THE HONORABLE SHANIEK MAYNARD
                UNITED STATES MAGISTRATE JUDGE

18
19
20

APPEARANCES:

21

22   Counsel on behalf of the Plaintiff:

23                  UNITED STATES ATTORNEY'S OFFICE
                    101 South U.S. Hwy 1,
24                  Suite 3100,
                    Fort Pierce, FL 34950
25                  BY:  DIANA M. ACOSTA, AUSA

```
 1

 2   APPEARANCES CONTINUED:

 3   Counsel on behalf of Defendant:

 4                  FEDERAL PUBLIC DEFENDER'S OFFICE
                    109 North 2nd Street,
 5                  Fort Pierce, FL 34950
                    BY:  FLETCHER PEACOCK, AFPD
 6

 7

 8

 9   Transcribed By:

10                  BONNIE JOY LEWIS, R.P.R.
                    7001 SW 13 Street
11                  Pembroke Pines, FL  33023
                    954-985-8875
12                  caselawrptg@gmail.com

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1               I N D E X

2

3  THE WITNESS:                                    PAGE:

4

5  FBI TFO ANDREW BOLONKA

6

7  Cross Examination by Mr. Peacock:              14

8  Redirect Examination by Ms. Acosta:           21

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Thereupon, the following proceeding was held:)

2          THE COURT:  All right.  Good morning.

3          This is the matter of United States of America versus

4    Everette Jerome Jackson, Jr.  This is Case Number 21-056-WM.

5          May I have the parties' appearances beginning with

6    counsel for the Government.

7          MS. ACOSTA:  Diana Acosta on behalf of the United

8    States.  Good morning, Your Honor.

9          And also attending is FBI TFO Andrew Bolonka who is

10   available for cross-examination.

11         THE COURT:  Good morning to you Miss Acosta and good

12   morning TFO Bolonka.

13         And may I have an appearance from the Defense, please.

14         MR. PEACOCK:  Fletcher Peacock on behalf of Mr.

15   Jackson, Your Honor.  We are both appearing by Zoom.

16         THE COURT:  Good morning, again, Mr. Peacock and good

17   morning, Mr. Jackson, sir.

18         Mr. Jackson, are you able to hear me?

19         THE DEFENDANT:  Yes, ma'am.

20         THE COURT:  Okay.  And can I also have an appearance

21   from the United States Probation Officer.

22         U.S. PROBATION:  Good morning, Your Honor.  Nathan

23   Vreeland, U.S. Probation.

24         THE COURT:  Good morning.

25         Okay.  So we are here for a detention hearing in this

1  matter.

2          Mr. Jackson, the first thing I want to address with

3  you is the fact that we are conducting this hearing by

4  videoconference.  You do have the right to have your hearing in

5  person in the courtroom with the Judge.

6          However, due to COVID-19, we have been trying to limit

7  the numbers of people that come in and out of the federal

8  courthouses.  We can only proceed today by videoconference if

9  you consent to allow us to do so.

10          So I first need to ask if you are willing to allow us

11  to conduct this hearing today by videoconference?

12          THE DEFENDANT:  Yes, ma'am.

13          THE COURT:  And you are able to see me and hear me

14  clearly; is that correct?

15          THE DEFENDANT:  Yes, ma'am.

16          THE COURT:  If at any time you have any technical

17  difficulties whatsoever, you can't see or hear the

18  participants, or the screen freezes, or you get kicked out of

19  the Zoom room, let the detention officer know.

20          We will pause the hearing and wait for you all to sign

21  back in because the purpose of the hearing really is to make

22  sure that you understand everything happening with your case.

23          Okay, sir?

24          THE DEFENDANT:  Yes, ma'am.

25          THE COURT:  I also want to remind you that if at any

1   point you need to speak with Mr. Peacock privately during the

2   hearing, or you have any questions, or you want to relay

3   anything to him, just let me know that and we will create a

4   videoconference room where you can speak to him without the

5   rest of us being able to hear you.

6          Okay, sir?

7          THE DEFENDANT:  Yes, ma'am.

8          THE COURT:  All right.  Before we get started, I am

9   also going to enter the Due Process Protection Act order in

10  this case.  The Court confirms the obligation of the United

11  States Government to produce all exculpatory and impeachment

12  evidence to the Defendant pursuant to *Brady v. Maryland* and its

13  progeny.

14         The Court orders the Government to do so.  Failing to

15  do so in a timely manner may result in consequences, including

16  but not limited to, exclusion of evidence, adverse jury

17  instructions, dismissal of charges, contempt proceedings, or

18  sanctions by the Court.

19         All right.  Mr. Peacock, are we proceeding with the

20  detention hearing today?

21         MR. PEACOCK:  Yes, ma'am, we are proceeding with the

22  detention hearing.

23         I will inform the Court that Mr. Jackson does have

24  collateral charges from the same incident in state court and he

25  is presently in state custody.  On his bond we would like to

1  proceed with the detention in federal court today.

2          Your Honor, I would -- if Agent Bolonka is available

3  for cross-examination, I would ask if there is any Jencks

4  material.

5          THE COURT:  Miss Acosta?

6          MS. ACOSTA:  The Jencks material is the complaint that

7  was filed in this case.

8          THE COURT:  Okay.  Mr. Peacock, do you have a copy of

9  the complaint?

10          MR. PEACOCK:  I do have the complaint, Your Honor, but

11  I take that to mean that there are no FBI 302s available?

12          MS. ACOSTA:  That is correct.

13          MR. PEACOCK:  Very well.

14          THE COURT:  Okay.  Let's see.

15          Miss Acosta, do you have a copy of the Pretrial

16  Services Report?

17          MS. ACOSTA:  Yes, Your Honor, I do.

18          THE COURT:  Mr. Peacock, do you have a copy?

19          MR. PEACOCK:  I do.

20          THE COURT:  Any objection to the Court relying on the

21  report for purposes of this hearing only?

22          MR. PEACOCK:  No, ma'am.

23          THE COURT:  Okay.  All right.  Miss Acosta, will you

24  be proceeding by proffer?

25          MS. ACOSTA:  I will, Your Honor.

1        And I will ask the Court to take judicial notice of

2   the complaint that has been filed in this case.

3        THE COURT:  Yes.

4        MR. PEACOCK:  And Judge, if I may?

5        Just so the Court knows in reference to the Pretrial

6   Services, I actually have two separate documents; one is a

7   prior records document and one is a background report.

8        THE COURT:  Do you have the typewritten report that

9   puts it all together?

10       MR. PEACOCK:  No, ma'am.  What I'm looking at is

11  handwritten, but I think it probably contains the same

12  information.

13       THE COURT:  I think it is the same information.

14       But just in case, Officer Vreeland, or Miss

15  Griffen-Arnold, can you all just e-mail Mr. Peacock a copy of

16  the most recent Pretrial Services Report?

17       MR. PEACOCK:  I think Officer Vreeland already did.

18       THE COURT:  Okay.  Perfect.

19       All right.  What I would like to do is just take a

20  couple of minutes so that I can go over the Pretrial Services

21  Report before we get started.  So hold momentarily.  It should

22  only take me a couple of minutes.

23       All right.  Miss Acosta, you may proceed.

24       MS. ACOSTA:  Thank you, Your Honor.

25       We are proceeding under risk of flight, Your Honor,

1  and also a danger to the community.  This is not a rebuttable

2  resumption case.  As to the risk of flight, Your Honor, I will

3  address that first.

4        He does have a juvenile record and when he was 17, he

5  had an aggravated assault with a deadly weapon where he got the

6  withhold for adjudication of delinquency and got probation.  He

7  did violate his probation and got more probation as to that

8  offense.  So he has one VOP.

9        Also, as an adult, he was on probation for sale of

10  marijuana.  And during the disposition of that case, Your

11  Honor, a bench warrant was issued and the state actually

12  amended the charging document and added a third count, which

13  was failure to appear; third degree felony.

14        I'm not sure if that was issued after he pled or

15  because he failed to appear for a calendar call, but he

16  obviously failed to appear and was charged and convicted of

17  that and sentenced to 18 months in the Department of

18  Corrections and probation.

19        And when he was released from the Department of

20  Corrections, he violated his probation by being found with a

21  firearm in his vehicle during a traffic stop.  He was charged

22  with that new felony, adjudicated, and also a violation of his

23  probation.  And he was sentenced to 40 months in the Department

24  of Corrections on both cases to run concurrent.  He was

25  released from the Department of Corrections on May 26th of

1   2020.

2         If we fast-forward to Memorial Day of 2021, May 31st

3   when this occurred, and as the complaint sets out, the first

4   deputy got a call of a noise complaint at Pepper Park.  He

5   proceeded to Pepper Park and lowered his window to hear.

6         As he approached the car to see if he could hear the

7   loud noise to corroborate the reason why he was dispatched to

8   the location, he heard gunfire, which of course prompted him to

9   go right towards where he heard the gunshots where he proceeded

10   to see a crowd of people beginning to disburse running

11   everywhere and, of course, kids and family all there to

12   celebrate the holiday.

13         And he is trying to figure out what is going on.  So

14   at the time that he approaches Pepper Park, he sees a black

15   vehicle depart the park at a high rate of speed and he thinks,

16   well, maybe they were associated with what happened.

17         And just for the record, they were not, but that kind

18   of prompted law enforcement is out responding to the shots

19   fired and, then, of course, there is dispatch and other law

20   enforcement is responding to Pepper Park and also to a BOLO,

21   be-on-the-lookout, for that black vehicle.

22         So as the first deputy goes to Pepper Park, people

23   point and tell him that there is shootings and that someone was

24   hit.  So he proceeds to where the female is and he notices that

25   he did sustain an injury to the leg.  He sees blood.  He talks

1  to different witnesses to try to determine what happened.

2          And one of the witnesses says that a black male

3  wearing, I believe a scarlet shirt, shot multiple times towards

4  the vehicle and hit the victim.  That everyone ducked and was

5  running and that she had the wherewithal actually to record the

6  shooter as he left.

7          And in that recording, which she showed to the deputy

8  right then, showed a black male wearing a red shirt and a white

9  sleeved shirt.  It shows him with the firearm and putting the

10 firearm into his waistband and getting into a white vehicle and

11 leaving.

12         Almost simultaneously on the North Causeway Bridge,

13 law enforcement sees that black vehicle that the BOLO had been

14 issued for and does a U-turn because the vehicles are going

15 east on the North Causeway Bridge to go to Pepper Park.

16         He does a U-turn and just happens to be behind or

17 close to a white Kia.  And the only reason that that white Kia,

18 Your Honor, became a full complaint if anything is because a

19 black male exits the Kia and goes onto the walkway and throws a

20 firearm into the Intercoastal and proceeds to try to run on

21 foot, but law enforcement is all over the North Causeway

22 Bridge.  They get him and they arrest him and they also take

23 the woman who was driving the vehicle out of the car.

24         It's around 7:30 at night.  The deputy was able to

25 direct someone that's in the water to put some kind of flier in

1   the vicinity where he saw the firearm drop into the water.  And

2   the next day the dive team comes and retrieves the firearm from

3   the water.  They take the firearm eventually to the Indian

4   River Crime Lab.

5         Now, if we go back to Pepper Park, subsequent

6   investigation shows that there were multiple gunshots fired to

7   a black Mercedes.  And the Crime Scene goes and picks up

8   numerous cases and bullet fragments.  And in fact, the original

9   deputy who had gone to see the victim with the gunshot wound,

10  helped put pressure on the gunshot wound and while doing that a

11  bit of a fragment came out and he put that into evidence.

12        So the firearm and the spent casings and also the

13  fragment from what was removed from the victim's leg, along

14  with the hospital, was also given to law enforcement and taken

15  to the Indian River Crime Lab and has been examined by a

16  firearm examiner who determined that the firearm was in working

17  order.

18        They took the firearm out of the water and they

19  treated it with different oils so they could see if it was

20  still working.  And they were able to do that and determine

21  that it was in working order despite the fact that it had been

22  thrown into the water.

23        They compared the casings and some of the bullet

24  fragments.  And out of approximately nine of the casings

25  matched the firearm, which was described in the complaint as a

1   Smith and Wesson Model SD40 and the casings also matched that

2   type of firearm.

3          Your Honor, at the time of his arrest, he was wearing

4   the same red shirt, white T-shirt.  I also note for the record

5   that he is very distinctive.  He's at least 6'5 and weighs

6   close to 390 pounds.

7          You look at the video that captures him putting the

8   firearm in his pants and you look at him immediately after his

9   arrest and he was obviously the same person.  Only minutes had

10  passed by.

11         I would also note that there was an individual on the

12  bridge who was doing a Facebook live video and actually she was

13  narrating what was happening on the bridge.  And that

14  subsequently a search warrant was done for Facebook.  And law

15  enforcement obtained a copy of the Facebook live video, but it

16  shows everything that I have just said.

17         It shows the deputy doing the U-turn, approaching the

18  occupant of the -- the Defendant getting out of the vehicle

19  going towards the -- and throwing something overboard.

20         I honestly couldn't tell exactly what it was because

21  you do see his hand motion as though he is throwing something

22  across the way.  But the deputy that was there clearly see that

23  it was a firearm because obviously they took steps to make sure

24  that they would go back and retrieve that firearm.

25         Your Honor, at this time, I would conclude the

 1  Government's proffer for both risk of flight and danger to the

 2  community and would ask for argument later on.  Unless you want

 3  me to go into argument now, Your Honor.

 4          THE COURT:  So, thank you, Miss Acosta.

 5          Let me see.  Mr. Peacock, do you want to cross-examine

 6  the agent?

 7          I can't hear you.  Sorry.

 8          MR. PEACOCK:  I'm sorry.  I do have some questions,

 9  Your Honor.

10          THE COURT:  Sure.

11          Agent, if you could raise your right hand and be sworn

12  in by the courtroom deputy.

13          THE WITNESS:  (Complied.)

14  (Witness sworn.)

15          THE COURTROOM DEPUTY:  Please state your name and then

16  spell your last name for the record.

17          THE WITNESS:  Andrew Bolonka; B-O-L-O-N-K-A.

18          THE COURTROOM DEPUTY:  Thank you.

19          MR. PEACOCK:  May I proceed, Judge?

20          THE COURT:  Yes.  Sorry.  Counselor, you may inquire.

21          MR. PEACOCK:  Thank you.

22          FBI TFO ANDREW BOLONKA, GOVERNMENT'S WITNESS SWORN

23                         CROSS EXAMINATION

24  BY MR. PEACOCK:

25  Q.  Good morning, Agent Bolonka.

1  A.  **Good morning, Counselor.**

2  Q.  You can hear me okay?

3  A.  **Yes, sir.**

4  Q.  Okay.  Just some questions.

5      When did you get involved in this case?

6  A.  **Shortly a couple of days after the actual incident**

7  **happened.**

8  Q.  And are you part of a task force that deals with firearms?

9  A.  **Yes, sir.  I'm signed to the FBI Safe Street Task Force.**

10  Q.  So you were not there on the day that it occurred?

11  A.  **No, sir.**

12  Q.  All right.  So how many days, again, do you think passed

13  before you were informed?

14  A.  **Maybe two or three.**

15      **The way I learned about the case was reviewing the hot**

16  **sheet information that we get through the Sheriff's Office of**

17  **events that happened the previous day.**

18  Q.  Okay.  Have you authored any 302s on this?

19  A.  **No, sir.**

20  Q.  Okay.  Was Mr. Jackson arrested on May 31st?

21  A.  **On the day of the event, yes, sir.**

22  Q.  He was.  Okay.  When I look at his Pretrial Services

23  Report, it actually shows an arrest date of June 23rd.

24      Do you have any idea why that would be would that be when

25  the case was filed, perhaps, or do you know?  If you don't

1  know --

2  A.  **Perhaps, but I don't know.**

3  Q.  Okay.  Now, when Mr. Jackson was taken into custody, did he

4  make any post arrest statement?

5  A.  **I did not conduct any of the interviews post his arrest,**

6  **sir.**

7  Q.  Have you attempted to interview Mr. Jackson?

8  A.  **No, sir.**

9  Q.  Are you aware -- it sounds like you are to some extent --

10  aware of the circumstances of his arrest.  When Mr. Jackson was

11  arrested did he resist arrest in any fashion?

12  A.  **Not to my knowledge.**

13  Q.  Now, the incident that occurred over by Pepper Park, there

14  was some mention of a black Mercedes.  Are you familiar with

15  that?

16  A.  **Yes, sir.**

17  Q.  Is that the victim's vehicle?

18  A.  **Yes, sir.**

19  Q.  And the victim, I guess, was shot at some point; is that

20  correct?

21  A.  **Yes, sir.**

22  Q.  And do you know where the victim was shot?

23  A.  **It was in one of the legs, but I don't know which one.**

24  Q.  Did the victim go to the hospital?

25  A.  **Yes, sir.**

1  Q.   Was the victim interviewed?

2  A.   **Not by myself.**

3  Q.   Well, by anybody that you are aware of?

4  A.   **I believe Detective Lafleur; Christine Lafleur conducted**

5  **the interview with him, but I'm not exactly sure.**

6  Q.   Is that a St. Lucie detective?

7  A.   **Yes, sir.**

8  Q.   Now was a gun recovered from the victim?

9  A.   **No, sir, not to my knowledge.**

10 Q.   Do you suspect the victim of having a firearm during the

11 incident?

12 A.   **Nothing that I saw in review of the case led me to believe**

13 **that.**

14 Q.   Do you know what caused the confrontation?

15 A.   **I do not.**

16 Q.   Did the victim give any statement about what caused the

17 confrontation?

18 A.   **No, sir.  By all accounts, it appears that the victim is**

19 **collateral damage in the incident.**

20 Q.   And what do you mean by that?

21 A.   **I believe that there was a verbal confrontation that**

22 **occurred possibly because of the Defendant somehow being**

23 **around, or near, or leaning on the victim's vehicle that**

24 **somehow led to an altercation or a verbal altercation between**

25 **the victim and the Defendant.**

1  Q.   Was there an actual physical fight?

2  A.   **There is some video captured of their interaction and that**

3  **particular video, any altercation that's happening between them**

4  **is happening just off of screen.**

5  Q.   Can you tell anything about it is it a fistfight?  Was

6  there another weapon used?  What can you tell from the video?

7  A.   **From my recollection, without reviewing it at the moment,**

8  **the Defendant was moving through the crowd quite aggressively.**

9  **It appeared as though there might have been an altercation**

10 **between two females that was somehow involving the Defendant**

11 **that ultimately spilled over into the area where the black**

12 **Mercedes was parked and people were gathered, which ultimately**

13 **led to the confrontation between the Defendant and the victim.**

14 Q.   Okay.  But when you said that you thought the victim of the

15 gunshot wound might be collateral damage, was there another

16 intended victim or what?  I don't think I quite understand?

17 A.   **By that I mean that the Defendant was not at that location**

18 **seeking out the victim.**

19 Q.   Okay.  It's your understanding that there was a spontaneous

20 confrontation that ultimately ended in a shooting?

21 A.   **I couldn't speak to the fact on whether it was spontaneous**

22 **or not, but looking at the totality of what I have reviewed on**

23 **the videos, it appears that there may have been something that**

24 **was occurring prior to the arrival of the Defendant and the**

25 **vehicle in the vehicle arriving at Pepper Park that led up to**

1  what happened that day at Pepper Park.

2  Q.   Do you know whether or not there was bullet damage to the

3  Mercedes?

4  A.   **There was.**

5  Q.   And has that been recorded?

6  A.   **Yes, sir.**

7  Q.   Was there any other damage from gunfire shots at that

8  scene?

9  A.   **Outside of the Mercedes --**

10  Q.   And the victim?

11  A.   **Not to my knowledge.**

12  Q.   Now, you indicated in your complaint that a fragment was

13  obtained from the victim; a bullet fragment was obtained.  What

14  do you mean by that?

15  A.   **That would not be a complete projectile, but a portion of a**

16  **projectile.**

17  Q.   Okay.  Was that removed from the victim?

18  A.   **I would have to refer to the report to answer accurately.**

19  Q.   Okay.  Does that indicate to you that the victim might not

20  have been the target of the shooting, but just got hit by a

21  fragment?

22          MS. ACOSTA:   Objection to speculation, Your Honor.

23          MR. PEACOCK:   I think it is very important, Judge,

24  whether there was specific intent to shoot somebody, or whether

25  this person was hit by a fragment that came off of a bullet

1    that was shot somewhere else.  That's my point.

2         THE COURT:  I will let the agent answer to the extent

3    that he knows the answer to the question.

4         THE WITNESS:  Thank you, Your Honor.

5    A.  **Counselor, the shots began shortly after the verbal and**

6    **slight physical altercation that occurred between the Defendant**

7    **and the victim in this case.**

8         **Like I spoke earlier, that actually happened kind of off**

9    **vehicle.  The Defendant is partially observed on a vehicle what**

10   **appears to be drawing the handgun from his waistband and**

11   **pulling back and then firing towards the direction of where the**

12   **victim would be.**

13   Q.  Okay.  Do you know if the victim was hospitalized or was

14   the victim released?

15   A.  **I believe released.**

16   Q.  Now, also in your complaint, in Paragraph 14, you indicate

17   that bullet fragments collected on the scene and from the

18   victim was identified as having been fired from a Smith and

19   Wesson that you indicate was thrown off the bridge.

20        How were those fragments tied to that gun?

21   A.  **So they were all submitted; the firearm fragments, all the**

22   **evidence was submitted to the Indian River Crime Lab.**

23        **And the Crime Lab performed the forensic examinations of**

24   **the firearm and projectiles and provided the information of**

25   **their findings.  What is listed in my complaint is a result of**

1   the findings of the Indian River Crime Lab.

2           MR. PEACOCK:  Okay.  Thank you.  Thank you, Agent

3   Bolonka.

4           THE WITNESS:  Yes, sir.  Thank you, Counselor.

5

6           THE COURT:  In this case on that, Miss Acosta?

7           MS. ACOSTA:  Just a couple of questions, Your Honor.

8           THE COURT:  Sure.

9                       REDIRECT EXAMINATION

10  BY MS. ACOSTA:

11  Q.   Was the Mercedes shot at approximately 13 times?

12  A.   I could answer that.  I saw 13 rounds fired in the video.

13  I don't know if all 13 hit the vehicle from my recollection of

14  right now, but I believe they recovered close to that number of

15  projectiles.

16  Q.   And do you know how many gunshot, I guess, damage to the

17  vehicle there was?

18  A.   There was a significant, but I don't know the exact number

19  without referring to the report.

20  Q.   Were there any other vehicles that had any damage from the

21  shots fired?

22  A.   None that were identified that we are aware of.

23  Q.   And were there any other firearms recovered from that area

24  in Pepper Park on Memorial Day?

25  A.   No, ma'am.

1        MS. ACOSTA:  Your Honor, I have no further questions.

2        THE COURT:  Okay.  Thank you, Agent, for your

3   testimony.

4        THE WITNESS:  Thank you, Your Honor.  I appreciate it.

5        THE COURT:  Any other evidence, Miss Acosta?

6        MS. ACOSTA:  No, Your Honor.

7        THE COURT:  Any evidence, Mr. Peacock?

8        MR. PEACOCK:  No, ma'am.

9        THE COURT:  Okay.  I will hear argument from you, Mr.

10  Peacock.

11       MR. PEACOCK:  Your Honor, we will stand on the record.

12       THE COURT:  Okay.  The Court has heard the evidence

13  and the testimony and finds that detention is appropriate in

14  this case.

15           I will note that the Defendant is a life-long resident

16  of the Southern District of Florida.  However, as to the issue

17  of risk of flight, his criminal history demonstrates the number

18  of failures to appear, or violations of probation, which

19  suggests to this Court that since he did not appear for those

20  cases, or did not follow the Court's instruction in those

21  cases, he is unlikely to appear for further hearings in this

22  case or to follow any instructions set by the Court.

23           And just for the record on that, it looks like in 2017

24  he was arrested for a violation of probation and admitted to

25  that.  In 2016 he was arrested for failure to appear twice or

1  maybe as a result of that, he was charged with failure to

2  appear and convicted on that offense.  And it also looks like

3  in 2011 he admitted to having violated his probation.

4       I also find that he is a danger to the community.

5  Although this is not a presumption case by nature of the

6  offense that is charged, which is being a felon in possession,

7  the circumstances of the case definitely indicate a danger to

8  the community and that is open firing at a public park in a

9  public beach and that ultimately, perhaps inadvertently, but

10 resulted in an individual actually getting shot, as well as

11 property damage.

12      In addition, his criminal history shows a conviction

13 in, it looks like he pled no contest in 2010 at the age of 17

14 to aggravated assault with a deadly weapon, as well as some

15 other arrests.  Here, although they did not result in

16 convictions and were juvenile offenses, they also are quite

17 dangerous; robbery with a weapon in 2011 and another aggravated

18 assault with a deadly weapon in 2014.

19      So based on his criminal history, as well as the

20 nature and circumstances of the offense that he is charged

21 with, this court does find that there is no condition or

22 combination of conditions that could reasonably assure the

23 public's safety or could reasonably assure that he would show

24 back up in court or follow conditions set by this Court.  And

25 as a result, the Court will detain Mr. Jackson and will issue a

1  written order in that regard.

2          All right.  Miss given around, have we set a date for

3  arraignment or preliminary hearing in this matter?

4          THE COURTROOM DEPUTY:  We have, Your Honor.  It is set

5  for next Monday, August 30th at 10:00 a.m.

6          THE COURT:  All right.  So, Mr. Jackson, that

7  concludes your hearing today.  Your next court appearance will

8  be Monday, August 30th.

9          At that point, if the Grand Jury has issued charges

10  against you, we will make sure that you understand those

11  charges and the possible penalties.  And if no charges have

12  been issued by the Grand Jury, the Court will hold a hearing to

13  make sure that there is probable cause to continue with this

14  case.

15          Mr. Peacock, is there anything else that I need to

16  address today?

17          MR. PEACOCK:  No, ma'am.

18          THE COURT:  Anything, Miss Acosta?

19          MS. ACOSTA:  No, Your Honor.

20          THE COURT:  Anything officer Vreeland?

21          U.S. PROBATION:  No, Your Honor.  Thank you.

22          THE COURT:  All right.  That concludes your hearing

23  today, Mr. Jackson.  I wish you the best of luck as you move

24  forward and handle these charges.  Take care.

25          (Thereupon, the proceedings concluded.)

1

2                               CERTIFICATE

3

4          I hereby certify that the foregoing transcript is an

5    accurate transcript of the audio recorded proceedings in the

6    above-entitled matter.

7

8

9

10
     12/20/21                        Bonnie Joy Lewis,
11                          Registered Professional Reporter
                               CASE LAW REPORTING, INC.
12                             7001 Southwest 13 Street,
                             Pembroke Pines, Florida 33023
13                                  954-985-8875

14

15

16

17

18

19

20

21

22

23

24

25